IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

GALVESTON DIVISION

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| VS. | § | CRIMINAL NO. G-07-24 |
| | § | |
| DANIEL ERNEST SMITH | § | |

### REPORT AND RECOMMENDATION

Before the Court, by referral from the District Court, is the "Motion to Suppress" of Defendant Daniel Ernest Smith. Smith is before the Court charged with being a felon in possession of a firearm. Through his Motion, Smith seeks to suppress the pistol made the basis of this prosecution and certain statements he made which evidence his possession of it. On September 28, 2007, the Court conducted an Evidentiary Hearing on the Motion. Having considered the Motion and arguments of counsel and reviewed the transcript of the Evidentiary Hearing, the Court submits this Report and Recommendation to the District Court.

Gabriel Turcios, the apartment manager at the Baywalk Apartments in Galveston, Texas, testified that shortly after he rented Apartment 1114 to Tasha Matthews in November 2006, he began to see Smith at the complex on a regular basis and noticed a lot of people coming and going in the vicinity of the apartment. On at least one occasion he confronted Smith who told him he babysat Matthews' infant son. Matthews also told Turcios that Smith was babysitting while she worked during the days as a correctional officer at the prison unit of the University of Texas Medical Branch in Galveston, Texas. The heavy traffic of people on the premises soon after Smith's appearance made Turcios suspect drug dealing was occurring at one of the apartments. To investigate, Turcios first went to Apartment 1112. The tenant there told him the activity was

all taking place at Apartment 1114.  Ultimately, on or about January 25, 2007, Turcios called the Galveston Police Department hotline and reported the "suspicious activity" at Apartment 1114.

Joey Quiroga, a Galveston Police Officer assigned to the Drug Task Force, testified that from experience he knew the Baywalk Apartment complex was a "drug area." In fact, on January 23, 2007, just three days before Smith's arrest, Quiroga had participated in a "knock and talk" investigation of one of the apartments during which the tenant stated he had seen a lot of people coming and going during the daytime hours at Apartment 1114.  At the time, Quiroga actually saw two people approach Apartment 1114, knock on the door and be admitted.  After Quiroga finished his knock and talk investigation he went to Apartment 1114.  He smelled the "stale stench of burnt marijuana" at the door and knocked, but no one answered.  As a result of his investigation on January 23, Quiroga set up "loose surveillance" on the apartment.

Within a day or two, Quiroga became aware of a hotline call regarding possible drug trafficking at Apartment 1114.  The caller complained of a black male who drove a bright green car who appeared to be living at the apartment with the tenant, Matthews.  From another source, Quiroga was able to ascertain that the black male in question was probably Smith.  After a records check, Quiroga learned Smith had "some kind of felony conviction" and no valid driver's license.

In the early evening of January 26, 2007, during a surveillance drive by the apartment and with the intent of conducting a "knock and talk" investigation, Quiroga and fellow officers Owens and Vela saw the bright green car.  Apparently, it had just arrived because the people inside were in the process of exiting.  Owens pulled the unmarked police car behind the green car and, since it was getting dark and the car was blocking part of the traffic lane of the parking lot, activated the overhead lights for safety.

2

Quiroga went to the driver's side door of the green car as Smith got out. Matthews was getting out of the passenger side and a small boy was in a car seat in the back seat. When Quiroga asked who owned the car Matthews claimed she did. Quiroga then explained to Matthews that there had been complaints of drug dealing at her apartment and asked if there were any drugs in her car. Matthews said there were none and, when asked if she would allow the car to be searched, gave Quiroga her verbal consent to search it. Upon request, Matthews was permitted to take her son into the apartment. Quiroga quickly patted down Smith for weapons and then directed him to go stand on the sidewalk; Smith complied. Owens and Quiroga then searched the car. After nothing was found in the car, Quiroga prepared a written consent form for Matthews to sign to memorialize the fact that she had consented to the search. Once the vehicle information had been written on the form, Quiroga walked toward the apartment to present it to Matthews for her signature. Smith walked with Quiroga to the apartment door.

Meanwhile, after Matthews was permitted to take her son inside, Vela went with her. Because the officers had intended to perform a knock and talk with the hope of being allowed to search the apartment, he escorted her to try to make sure she did not attempt to destroy any possible evidence. According to Vela, as they approached the door the following conversation took place. Vela asked, "Is there anyone in your apartment?" Matthews replied "No, there is no one in there." Vela then asked, "Do you mind if I walk in with you to make sure because I don't want someone in there that's hiding and I don't want you destroying evidence if there is evidence in there?" Matthews then said, "That's fine. You can come in with me." Vela testified that as soon as he walked a few feet inside he looked around to see if anyone else was present and saw a quantity of marijuana in plain view on top of a microwave oven in the kitchen. Vela asked, "Is

that marijuana?" and Matthews just let out a long sigh of disbelief.  At that point, Vela and Matthews stopped until the other officers arrived.

Within moments, Quiroga, Owens and Smith came to the door.  Vela opened the door and told Quiroga about the marijuana.  When Matthews saw Smith she said, "I can't believe you did this to me."  Smith simply said, "I'm sorry."  Quiroga then ordered Smith to sit on the couch in the living room.  Quiroga then asked if Matthews would consent to a search of the apartment.  Matthews was hesitant, in part because of her job as a correctional officer, but she agreed.  Quiroga then added her apartment to the consent form and asked her to sign it.  According to both Quiroga and Vela, Matthews reviewed the form and signed it.  Quiroga and Owens then began to search the apartment while Vela stood guard over Matthews and Smith, both of whom were seated on the couch.

During the search, Smith was asked if there was additional marijuana in the apartment.  He responded that there was and he walked to the bedroom with Quiroga and pointed out a small cigarette butt on the floor at the edge of the bed.  Smith was then ordered back to the couch.  In a dresser drawer in the bedroom Owens found a 9 mm magazine containing some bullets.  Quiroga suspecting a gun might also be present, went to Smith and asked if there was a gun in the apartment.  Smith answered "Yes" and began to reach under the couch.  Quiroga quickly ordered him to stop and move away.  Smith complied and Quiroga retrieved a pistol from beneath the couch where Smith had been reaching.  Quiroga asked Smith where he had gotten the gun and Smith said he bought it for protection from a man on the street after someone had tried to break into the apartment a few days ago.  Quiroga then asked if Smith had a felony conviction and Smith

4

said that he did.  Smith was then arrested.  At no time was Smith ever advised of his Miranda rights.

Tasha Matthews, who testified for Smith, contradicted the testimony of Quiroga and Vela in several ways.  She said she signed the consent form, after it had been filled out by Quiroga with information about the car, while she was still outside and before she was permitted to remove her son from the car.  As Vela walked with her to the apartment he questioned her about the traffic of people at the apartment and asked if anyone was in the apartment at that time.  She told him "No," and she unlocked the door.  Vela walked in first without permission, and promptly saw the marijuana.  Matthews, also promptly, denied having any knowledge of the marijuana.  By the time Vela began to ask her additional questions, Quiroga, Owens and Smith came inside.  Vela reported the marijuana to Quiroga and Smith and Matthews were ordered to sit on the couch.  The officers then searched the apartment without asking for permission.  According to Matthews, the information on the consent form referring to the apartment had to have been added to the form after the apartment was searched.  Matthews claimed that the pistol found by Quiroga belonged to her and that she personally had purchased it with money she was given by Smith.  She admitted Smith, who lived at the apartment with her at the time, had access to the pistol.

Smith does not challenge the reasonableness of Quiroga's decision to approach him on January 26 to discuss the complaints of possible drug trafficking.  Indeed, Quiroga had a reasonable suspicion, based on the apartment manager's information and his own investigations and observations, that criminal activity was occurring at Smith's apartment and such circumstances justified his decision to approach its occupants.  See United States v. Tobin, 923 F.2d 1506, 1511 (11th Cir. 1991)    Federal Courts have long recognized the "knock and talk" strategy as a

5

reasonable investigative tool, even when the intent of its use includes an attempt to gain consent to search.  United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2002)     Therefore, the initial confrontation of Smith and Matthews was perfectly legal.

Smith does not contest the clearly established law that a voluntary consent to search the apartment by one of its occupants would be valid, United States v. Matlock, 415 U.S. 164, 170 (1974), in the absence, as in the instant case, of the refusal of a joint occupant who is also present at the house at the time of the consent.  Cf. Georgia v. Randolph, 547 U.S. ____, 164 L.Ed. 2d 208, 226 (2006)    Consequently, the validity of Matthews' consent to the search of the apartment turns completely on two credibility calls.  First, did Matthews consent to Vela's request to enter the apartment in the first place?  On this issue, the Court finds Vela's testimony more credible, especially since it is apparent from Matthews' testimony that she believed nothing incriminating would be inside.  Second, did Matthews review and sign the consent form voluntarily after Quiroga had modified it to include the apartment?  Again, the Court finds the testimony of Quiroga and Vela, that after a brief hesitation Matthews read and signed the form, to be the most credible.  Certainly, Matthews was in what she perceived to be an extremely, and possibly coercive situation, but she may have well believed that she was not in custody for Smith's marijuana.  Moreover, there was no coercive police procedure used, Matthews had been cooperative with the officers throughout, and she was intelligent enough to know, and had read on the form, that she had the right to refuse.  See United States v. Cooper, 43 F.3d 140, 144 (5th Cir. 1995)    Accordingly, the Court finds that Matthews' consent to search the apartment was voluntary.

For reasons discussed below, the Court feels the need to find that the pistol is admissible under the Inevitable Discovery Doctrine.  The inevitable discovery exception provides that evidence is admissible if the prosecution shows that it would have been discovered in a lawful manner, had the prior illegality leading to its discovery not occurred, by virtue of ordinary investigations, leads already in the officer's possession or customary practices.  Nix v. Williams, 467 U.S. 431, 444, 448-450 (1980)    Because the officers, armed with Matthews consent and in possession of the loaded magazine they had found, would have inevitably discovered the pistol under the couch through routine search procedures used to search a confined area for drugs and weapons, this Court is of the opinion that the pistol is admissible.

The inevitable discovery exception is relevant because, in the opinion of this Court, a Miranda violation led directly to the discovery of the pistol by Quiroga.  The Government concedes that once Quiroga and Smith entered the house and were told of the marijuana by Vela, Smith and Matthews were no longer free to leave.  Notwithstanding its concession, the Government argues that this was a "soft" custody which made the Miranda warnings unnecessary. This Court disagrees.  Under the totality of the developing circumstances, any reasonable person in Smith's position would have understood that his freedom of movement was restrained to the degree that the law associates with a formal arrest once he was ordered by Quiroga to take a seat on the couch.  United States v. Galberth, 846 F.2d 983, 986, n.1 (5th Cir. 1988), U.S. v. Bengivenga, 845 F.2d 593, 596 (5th Cri. 1988) (en banc)    Consequently, once Smith had been ordered to sit on the couch he was entitled to the Miranda warnings.  In their absence, his admissions that there was additional marijuana and a gun in the apartment, that he had purchased the gun, and that he was a convicted felon are inadmissible.  Moreover, his behavior in pointing

7

out the marijuana and reaching for the gun in direct response to Quiroga's questions were clearly inadmissible testimonial communications so expressing Smith's mind as to constitute compelled self-incriminatory statements.  United States v. Green, 272 F.3d 748, 753 (5th Cri. 2001) citing Doe v. United States, 487 U.S. 201, 210 (1988)   The Court, therefore, believes this evidence should be suppressed.

For all of the foregoing reasons, it is the **RECOMMENDATION** of this Court that the Motion to Suppress (Instrument no. 14) of Defendant, Daniel Ernest Smith, be **DENIED** insofar as it seeks the suppression of the pistol and ammunition and **GRANTED** insofar as it seeks the suppression of all testimonial statements and acts by Smith after Quiroga ordered him to sit on the living room couch.

The Clerk **SHALL** send a copy of this Report and Recommendation to the Parties who **SHALL** have until **November 28, 2007,** in which to have written objections, filed pursuant to 28 U.S.C. §636(b)(1)(C), **physically on file,** in the Office of the Clerk.  The Objections SHALL be mailed to the Clerk's Office at P.O. Drawer 2300, Galveston, Texas 77553.  Failure to file written objections within the prescribed time **SHALL** bar the Parties from attacking on appeal the factual findings and legal conclusions accepted by the District Judge, except upon grounds of plain error.

**DONE** at Galveston, Texas this ___14th___ day of November, 2007.

_____
John R. Froeschner
United States Magistrate Judge

8